UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEVIN REAVES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-00151-JPH-DLP |
| | ) |
| WEXFORD MEDICAL SERVICES, et al. | ) |
| | ) |
| Defendants. | ) |

**Order Granting Motion for Summary Judgment**

Kevin Reaves alleges that he was denied necessary medical care for potential exposure to HIV when he was incarcerated by the Indiana Department of Correction ("IDOC"). He further claims that he was denied care for other health conditions, including diabetes, high cholesterol, high blood pressure and diabetic nerve pain. Mr. Reaves contends that the denial of care was the result of an unconstitutional policy, practice, or custom of Wexford of Indiana, LLC.[1] Wexford filed a motion for summary judgment and Mr. Reaves has responded. For the following reasons, the motion for summary judgment is **granted**.

**I. Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the

---

[1] Mr. Reaves's claim that defendant IDOC violated the Rehabilitation Act was addressed in a separate order. Dkt. 253.

nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Reaves as the nonmoving party. *See Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628 (7th Cir. 2018).

**A. The Assault on Mr. Reaves and Subsequent Treatment**

In January of 2019, while incarcerated at the Miami Correctional Facility ("MCF"), Mr. Reaves was attacked by an inmate who was suspected to be HIV positive. Dkt. 237-1 at 27:5-13 (Reaves Deposition).[2] The inmate cut Mr. Reaves with a razor blade that he had been shaving with and bit him. *Id.* Mr. Reaves was immediately taken to medical, evaluated in the clinic and ordered to receive antibiotics and HIV medications as prophylaxis. Dkt. 235-2 ¶ 8; 237-1 at 27:14-15; 243 ¶ 5. The nurse practitioner also ordered that Mr. Reaves be periodically tested for HIV and Hepatitis C ("HCV"). Dkt. 237-1 at 27:14-15; 34:7-21; 243 ¶ 5.

Mr. Reaves was transferred to Plainfield Correctional Facility ("PCF") three days after the assault. *Id.* at 27:15-21; 36:6-13. About five days later, he was called to have his HIV/HCV labs drawn. Dkt. 235-2 ¶ 8. But the lab draw did not happen on that day because the nurse who did lab draws was not at work that day. Dkt. 237-1 at 37:20-24. The lab draw occurred a few weeks later, *id.* at 48:19-22, and that was the only time Mr. Reaves's blood was drawn to test for HIV. *Id.* at 49:9-19.

Mr. Reaves received his medications, including his HIV prophylaxis, from medical staff at PCF approximately a week after his transfer. Dkt. 235-7 at 38:5-8. The parties dispute whether the delay was due to Mr. Reaves's refusal to take these medications or if they were not provided to him. Wexford states that Mr. Reaves had been non-compliant with his medications. Dkt. 235-2 ¶ 8. Mr. Reaves denies refusing his medications and testified that he was told that they were lost and would be reordered. Dkt. 237-1 at 42:10-13.

---

[2] The parties cited docket 235-1 for Mr. Reaves's deposition testimony. But that same deposition has been filed at docket 237-1. Because the deposition at docket 237-1 has been filed one page per sheet, rather than four pages per sheet, the Court cites that filing for ease of reference.

Mr. Reaves's HIV test was negative, but the parties dispute whether Mr. Reaves was told the results of his HIV test. Dkt. 235-2 ¶ 9; dkt. 235-3 at 24. Wexford contends that Mr. Reaves was told that, outside of chronic care visits, he would be notified only of abnormal results requiring intervention. *Id*. But Mr. Reaves testified that he does not recall Wexford staff telling him that he would only be informed of the results should he test positive for HIV. Dkt. 237-1 at 51:2-5. He also testified that despite his requests for the results of the blood draw, he was not told that he tested negative for HIV until he received initial disclosures from Wexford in this case. *Id*. at 138:1-12; 139:9-11. The delay in receiving his HIV test results caused Mr. Reaves significant mental distress. *Id.* at 52:5-19.

### B. Wexford's Policy Regarding Employees' Potential Exposure to Bloodborne Pathogens

Wexford follows the IDOC policy for employees who have potentially been exposed to bloodborne pathogens, like HIV or HCV. Dkt. 235-4 at 3-4; dkt. 243-1 at 2 (IDOC Policy 2.11A). IDOC's Bloodborne Pathogen Exposure Control Plan ("the Plan") includes emergency treatment, documentation, and blood testing. Dkt. 243-2 at 25–26. The Plan requires that, upon consent, an employee's "blood shall be tested as soon as possible to determine HBV and HIV infectivity (immediately upon consent being obtained, but no later than 5 working days)" *Id.* at 25. The Plan also requires Wexford to provide "post-exposure prophylaxis to the employee in accordance with US Public Health Service recommendations," "to arrange for any necessary counseling," and "any necessary follow up and plan any indicated follow up testing." *Id.* at 25–26. The Plan further states: "for maximum effectiveness, post exposure prophylaxis against HIV must be initiated within 1-2 hours of exposure." *Id.* at 26.

### C. Mr. Reaves's Medications and Diabetic Diet

When Mr. Reaves arrived at PCF, he was taking several prescription medications including Lipitor, lisinopril, Pamelor, Tylenol, Descovy, Isentress, and Bactrim. Dkt. 235-2 at ¶ 7. Nurse Williams, who had checked Mr. Reaves in upon arrival at PCF, told him that his keep on person ("KOP") medications would need to be checked into the system before they could be issued to him and that he would be summoned to medical to receive the medications within a few hours. Dkt. 237-1 at 36:6-21. A few days later, Mr. Reaves informed Wexford medical staff that he had not received his medications. *Id.* at 37:2-13. He was told that medical staff at MCF had forgotten to transfer the medications, but Mr. Reaves knew that this was not the case as he had already seen Nurse Williams in possession of the medications at PCF. *Id.*

It is Wexford's understanding that it is IDOC's practice to confiscate an inmate's property when an inmate is transferred so that it can be reviewed. Dkt. 235-4 at 3. This includes medications prescribed as KOP. *Id*. If medications are prescribed direct observed therapy ("DOT"), they are sent with the officers to the next facility to be given to the health care team. *Id*. The current orders remain active, but the new clinician at the receiving facility may choose to change the treatment plan. *Id*.

While at MCF, Mr. Reaves was prescribed a diabetic diet to ensure that his prediabetes did not progress to a point that would require treatment with insulin. Dkt. 237-1 at 53:10-21; 55:6-10. At PCF, this diet was discontinued. *Id.* at 54:9-10. After he complained about the discontinuation of this diet, Wexford staff told him that it would resume but it did not. *Id.* at 60:12-20.

At MCF, Mr. Reaves was also prescribed Pamelor for diabetic nerve pain. *Id.* at 53:12-13. This pain manifests mainly in his right leg, from the top of his buttock to the bottom of his foot. *Id.* at 71:1-6. Mr. Reaves also experiences throbbing in the leg, burning and stinging pain, and

5

numbness and tingling in his fingertips. *Id*. at 71:9-11, 14-16. After his transfer to PCF, Wexford stopped providing him with Pamelor because he was not taking it. Dkt. 235-2 at ¶ 10. Because of his visual impairments, it was hard for Mr. Reaves to get to the medication line to take his Pamelor, and he is aware that if you do not show up to take it that it will be discontinued. Dkt. 237-1 at 64:6-12. He testified that because it would take so long to get there, he stopped going to get his medications. *Id*. at 104:19-24. 17. Mr. Reaves testified that he has not asked about anything for nerve pain because he has "been dealing with the pain." *Id*. at 70:14-19.

Mr. Reaves submitted a health care request on August 21, 2019 complaining that his KOP medication for high blood pressure and high cholesterol were stopped. Dkt. 235-2 at ¶ 13. He was informed that although he had not requested refills, a refill request was submitted on August 23, 2019 in response to his health care request. *Id*. Under IDOC policy, when inmates receive KOP medication, they are expected to ask for refills when their medications are about to expire. *Id*. at ¶ 14.

Mr. Reaves saw the provider for a chronic care visit on August 24, 2019 for hypertension and hyperlipidemia. *Id*. at ¶ 15. His blood pressure was 150/100, and it was noted that he had not taken his medication. *Id*. He also had not taken a statin for hyperlipidemia, and the provider discontinued his prescription because his lipid panel was within normal limits. *Id*.

Mr. Reaves saw the provider next on November 15, 2019. *Id*. at ¶ 16–17. His blood pressure was 153/102. *Id*. Mr. Reaves reported that he took a blood pressure pill every time he got a headache and that he was taking four or five doses per day. *Id*. at ¶ 17. Before adjusting his dosage, the provider wanted to determine exactly how much he was taking, and so she changed his medication from KOP to DOT, meaning he would have to go to the medication line to receive it. *Id*. 18. On November 15, 2019, the provider also discussed with Mr. Reaves his prediabetes. *Id*. at

6

¶ 18. Mr. Reaves wanted to know why he was not on a special diet. *Id*. The provider reviewed his labs and told Mr. Reaves that his prediabetes was currently controlled, and no diabetic diet was necessary. *Id*.

### III. Discussion

Mr. Reaves alleges that Wexford was deliberately indifferent to his serious medical needs by failing to maintain a policy regarding the treatment of inmates exposed to bloodborne pathogens such as HIV and HCV and failing to care for his medical conditions including diabetes, high cholesterol, high blood pressure, and diabetic nerve pain. To prevail on an Eighth Amendment deliberate indifference claim, Mr. Reaves must demonstrate: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

Wexford is treated as a government entity for purposes of Section 1983 claims because it contracted to perform a government function—providing medical care to state prisoners—and thus acted under color of state law. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees. [It] can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)). To prevail on his claim against Wexford based on an unconstitutional policy or custom, Mr. Reaves must show that "he was deprived of a federal right" and he must also "trace the deprivation" to a Wexford policy or custom. *Dean v. Wexford Health Sources, Inc.*, -- F.4th --,

2021 WL 5230855 at *13 (7th Cir. Nov. 10, 2021). "Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Id.*

### A. Potential Exposure to HIV

Mr. Reaves claims that Wexford was deliberately indifferent to the risk that he had been exposed to HIV. Wexford argues that it is entitled to summary judgment because Mr. Reaves did not suffer a constitutional injury and, even if he did, he cannot show causation between Wexford's failure to have a policy and any injury. Dkt. 234. In response, Mr. Reaves argues that Wexford's failure to have a policy for treatment of inmates who have potentially been exposed to bloodborne pathogens such as HIV was a conscious decision not to take action that amounts to an unconstitutional policy. Dkt. 243 at 9–10.

For any *Monell* claim, the causation standard is "rigorous" and requires the plaintiff to show "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *Dean*, 2021 WL 5230855 at *13 (citations omitted); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). Establishing liability based on inaction is especially difficult "because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and resulting injury is more tenuous." *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020). "[A] failure to act amounts to municipal action … only if the [defendant] has notice that its program will cause constitutional violations." *Id.* at 379. This "requires a 'known or obvious' risk that constitutional violations will occur." *Id.* Evidence of a known or obvious risk can come from proof of a pattern of similar constitutional violations. *Id.* at 380.

Here, Mr. Reaves has not designated evidence of a pattern of similar alleged violations. Consequently, he must support his claim based on Wexford's failure to have a policy with a

showing that the "risk of constitutional violation [was] so high and the need for training so obvious that [Wexford's] failure to act can reflect deliberate indifference and allow an inference of institutional culpability…." *Id.* Mr. Reaves argues that Wexford ignored an obvious risk of potential inmate exposure to bloodborne pathogens and failed to create any policy to handle the potential for exposure. Mr. Reaves points out that Wexford follows IDOC's policy for treatment of employees exposed to bloodborne pathogens that includes required blood testing, prophylaxis, counseling, and follow-up testing. Dkt. 243-2 at 25–26.

Mr. Reaves relies on *Glisson* in support of his argument that IDOC's failure to have a policy for treating inmates who potentially have been exposed to HIV amounted to an Eighth Amendment violation. The plaintiff in *Glisson*, suing on behalf of her son's estate, alleged that her son died in prison because Corizon, Indiana's prison healthcare provider at the time, lacked a policy of ensuring coordination of care. 849 F.3d at 379. The court noted that Corizon was aware of but declined to adopt IDOC Guidelines addressing the coordination of medical care and found that this evidence could show that Corizon made a "conscious decision" to eschew a coordination of care policy. *Id.* at 380–81.

Here, the designated evidence shows that Wexford employees took responsive action upon learning that Mr. Reaves may have been exposed to HIV. Following the attack by the other inmate, Mr. Reaves was immediately sent to medical where a nurse practitioner ordered tests and prophylactic medication. Dkt. 237-1 at 27:14-15; 34:7-21. Mr. Reaves' claim for deliberate indifference with respect to treatment for his potential exposure to HIV is based on the allegations that (1) "the medication that [he] was put on to make sure that [he] did not receive HIV" got lost so he didn't immediately receive it; and (2) Wexford "failed to give [him] a lab draw to test [him] for HIV" until 24 days later. *Id.* at 28:12-21. In other words, Mr. Reaves alleges that Wexford

9

employees failed to carry out the steps that had been immediately ordered by the nurse practitioner in response to his potential exposure to HIV.

While Mr. Reaves did not receive the treatment as directed, there is no designated evidence showing that this was caused by Wexford's failure to have a policy for treating inmates who have potentially been exposed to HIV. Moreover, Mr. Reaves points to no evidence that orders issued at one facility, like the order to conduct HIV and HCV testing, are not regularly implemented when an inmate is transferred. *See Grieveson v. Anderson*, 538 F.3d 768, 774 (7th Cir. 2008) ("[W]hat is needed is evidence that there is a true municipal policy at issue, not a random event.") (internal quotation omitted). And Wexford did have a policy regarding the transfer of medications. Dkt. 235-4 at 3. There is no evidence that this policy was regularly ignored or that the fact that Mr. Reaves did not receive his medications immediately upon his transfer was the result of more than negligence by Wexford personnel. There is otherwise no designated evidence to support a conclusion that the risk that orders would not be followed or that medications would not be transferred was so high as to require a policy. In short, Wexford responded to Mr. Reaves' potential exposure to HIV by ordering testing and medication, and there is no designated evidence to support a conclusion that the alleged failure to follow through on those orders was more than an isolated instance. Mr. Reaves has thus failed to show a "direct causal link" between Wexford's failure to have a policy for treatment of inmates following potential exposure to HIV and his alleged constitutional deprivation.

### B. Diabetic Diet

Mr. Reaves also alleges that he was denied a diabetic diet when he transferred to PCF. It is undisputed that an individual provider determined that Mr. Reaves's diet was unnecessary. Dkt. 235-2 at ¶ 13. Mr. Reaves provides no evidence that this diet was necessary and therefore has not

presented any evidence that the denial of a diabetic diet violated his Eighth Amendment rights. Nor has he presented any evidence that the diet was discontinued based on a Wexford policy or practice.

### C. Medications

Finally, Mr. Reaves alleges he did not receive his medications when he arrived at PCF and that his medications were discontinued while at PCF. Wexford argues that Mr. Reaves did not suffer any harm because of the delay in receiving his medications upon his transfer to PCF. Wexford further argues that the discontinuation of any particular medication was not the result of deliberate indifference.

While there is a dispute of fact regarding why Mr. Reaves's medications were delayed when he arrived at PCF, there is no evidence that this delay was the result of a policy, practice, or custom on Wexford's part. It is undisputed that IDOC has a policy regarding the treatment of medications when an inmate is transferred which requires that KOP medications are confiscated and DOT medications are sent with the transport officers to be given to the healthcare providers at the next facility. Dkt. 235-4 at 3. Viewing the evidence in the light most favorable to Mr. Reaves, this policy was not followed when he was transferred to PCF, and the medications were lost. Dkt. 237-1 at 42:10-13. But there is no evidence that this was more than an isolated incident of negligence or that Wexford has chosen to eschew IDOC policy regarding the transfer of medications. *See Grieveson*, 538 F.3d at 774. Mr. Reaves therefore has failed to show that the delay in receiving his medications was caused by a Wexford policy or failure to have a policy.

Further, while some of Mr. Reaves's medications were discontinued while he was at PCF, it is undisputed that these medications were discontinued either because he was not taking them or because he did not ask for a refill. Dkt. 235-2 at ¶ 13 (medications stopped because Mr. Reaves

had not asked for a refill); ¶ 15 (statin discontinued because Mr. Reaves had not been taking it and his lipid panel was normal nonetheless); dkt. 237-1 at 64:6-12, 104:19-24 (Mr. Reaves stopped going to the medication window to take his Pamelor because of his visual impairments). Thus, there is no evidence from which a reasonable jury could conclude that the discontinuation of Mr. Reaves's medications was the result of deliberate indifference or a policy on Wexford's part of denying necessary care. Wexford is therefore entitled to summary judgment on Mr. Reaves's claim that his medications were denied or delayed.

## IV. Conclusion

For the foregoing reasons, Wexford's motion for summary judgment, dkt. [233], is **granted**.

**SO ORDERED.**

Date: 11/16/2021

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

KEVIN REAVES
2837 Boulevard Place
Indianapolis, IN 46208

All Electronically Registered Counsel